# AGREEMENT TO PROVIDE LABORATORY SERVICES
## TO LONG TERM CARE FACILITIES PURSUANT TO NYS EXECUTIVE ORDER 202.30

**THIS AGREEMENT** (the "**Agreement**") effective as of the last date of signature below, ("**Effective Date**"), by and between **Quest Diagnostics Incorporated** ("**Quest Diagnostics**") and **Sprain Brook Manor Rehabilitation** ("**LTC Facility**"). Each of Quest Diagnostics and LTC Facility may be referred to as a "**Party**" to this Agreement, and together, the "**Parties**".

**WHEREAS**, on March 7, 2020, Governor Cuomo and New York State issued Executive Order 202, declaring a State disaster emergency for the entire State of New York due to the COVID-19 pandemic (the "**Disaster Emergency**"); and

**WHEREAS**, as a result of the ongoing Disaster Emergency, Governor Cuomo issued additional Executive Order 202.30 on May 10, 2020 ("**EO 202.30**") directing, among other things, operators and administrators of all nursing homes and all adult care facilities, including all adult homes, enriched housing programs and assisted living residences (the "**Covered Facilities**") to test or make arrangements for the testing of all personnel, including all employees, contract staff, medical staff, operators and administrators, for COVID-19, pursuant to a plan developed by LTC Facility and filed with the New York State Department of Health; and

**WHEREAS**, in light of EO 202.30 and the ongoing Disaster Emergency, LTC Facility hereby engages Quest Diagnostics to perform the required COVID-19 testing for its staff and employees (the "**Covered Employees**") in compliance with and during the effective term of EO 202.30, and as may be extended or modified from time to time by Governor Cuomo and/or New York State;

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, and intending legally to be bound, LTC Facility and Quest Diagnostics agree as follows:

1. **RESPONSIBILITIES OF QUEST DIAGNOSTICS.**

    1.1 Quest Diagnostics shall provide LTC Facility with clinical laboratory testing services (the "**Testing Services**") as requested or ordered by persons who are authorized under state or federal law to order laboratory tests ("**Physician(s)**") for the Covered Employees of the LTC Facility as required by EO 202.30 and/or applicable state and federal law, regulation, or order regarding COVID-19 testing. Testing Services under this Agreement may be performed and billed by Quest Diagnostics or an entity controlled by or under common control with Quest Diagnostics.

    1.2 In support of the Testing Services, Quest Diagnostics will also provide LTC Facility with Quest Diagnostics test requisition forms, regularly scheduled courier services for the transportation of specimens to Quest Diagnostics and, delivery of test results as agreed upon between the parties.

2  **RESPONSIBILITIES OF LTC FACILITY.**

    2.1 LTC Facility shall be solely responsible for the collection of COVID-19 molecular/NAAT related specimens in compliance with all applicable state and federal laws and directives, including but not limited to EO 202.30. LTC Facility shall also ensure all specimen containers are properly identified, properly and safely secured, and maintained at proper temperature until delivered to Quest Diagnostics personnel.

2.2   LTC Facility shall ensure that Physician orders or requisitions for laboratory testing have been correctly completed and transmitted to Quest Diagnostics, including without limitation that all tests ordered and standing orders meet all federal and state requirements.

2.3   LTC Facility shall retain and assume responsibility for any and all chart audits and ensuring accurate completion of Quest Diagnostics test order requisition forms, including the correct third-party payor, governmental, and insurance billing information when and where applicable and in compliance with applicable laws and regulations.

2.4   LTC Facility shall notify its Covered Employees that their test results and associated protected health information relating to the medical surveillance of the workplace and work-related illnesses or injuries will be disclosed to the LTC Facility as their employer by either: (1) providing each and every Covered Employee with a copy of such required notice at or before the time of specimen collection; or (2) by posting such required notice in a prominent place and in a manner that is reasonably calculated to inform Covered Employees that their test results will be disclosed to the LTC Facility as their employer.

3   **BILLING/COMPENSATION.**

3.1   Quest Diagnostics shall have the right to bill LTC Facility for the Testing Services performed pursuant to this Agreement, and LTC Facility shall reimburse Quest Diagnostics for SARS-CoV-2 RNA (COVID-19), Qualitative NAAT, Test Order Number 39448 at rate of $100.00 per test.

3.2   LTC Facility agrees to make payment to Quest Diagnostics by check, ACH payment, certified money order, or electronic wire within thirty (30) days of the date of each Quest Diagnostics invoice for laboratory services, after which any undisputed unpaid invoice amounts shall be overdue.  Where available, LTC Facility will be invoiced monthly via Quest Diagnostics eInvoice (Quest web-based invoicing system) or other similar electronic invoicing system. Paper invoices may incur additional fees.  In the event that Quest Diagnostics sends the account for collection and/or initiates litigation in order to collect overdue amounts, LTC Facility shall be liable for all costs and expenses of such collection and/or litigation, including reasonable attorneys' fees, court costs and expenses.

4   **RECORDS.** The parties agree to maintain records for Testing Services provided to Covered Employees in such form and for such duration as may be required by Federal, State or local statutes or regulations, and to make available to the New York State Department of Health, the United States Department of Health and Human Services, the U.S. Comptroller General and/or their designees upon reasonable request and in a reasonable manner its books, documents, and records relating to its provision of services under this Agreement as may be required by applicable statutes and regulations. The parties further acknowledge and agree that these federal and state agencies and their designees may have the right to audit, evaluate, or inspect Quest Diagnostics' (or its subcontractors' or transferees') books, contracts, medical records, patient care documentation, and other records, related to recipients of federal and state funds.

5   **TERM**. This Agreement shall commence on the Effective Date and shall continue until EO 202.30 is expired, unless otherwise first terminated by either or both parties as set forth herein.

6   **TERMINATION.**

6.1   Either party can terminate this Agreement, with or without cause, upon ten (10) business days' prior written notice.

6.2   Material Change. Either party may, upon written notice to the other party, immediately terminate this Agreement upon the occurrence of any of the following events: (i)the other party makes an assignment for the benefit of creditors; (ii) a petition in bankruptcy or any insolvency proceeding is filed by or against the other party and is not dismissed within thirty (30) days from the date of filing; (iii) all or substantially all of the property of the other party is levied upon or sold in any judicial proceedings; (iv) the other party is excluded from participating in any federally funded program; (v) a loss of licensure by the other party that renders the other party unable to perform its obligations under this Agreement; (vi) if the party determines in good faith that any portion of this Agreement may

or does violate any law, rule, regulation or governmental policy, or any interpretation of any law, rule, regulation or governmental policy; or (vii) upon expiration of EO 202.30.

**7    MISCELLANEOUS.**

7.1   Independent Contractor.  The parties agree that each is an independent contractor engaged in the operation of its own business.

7.2   Assignment.  Services to be provided hereunder by Quest Diagnostics may be assigned to a subsidiary or affiliate or successor of Quest Diagnostics.

7.3   Notices. All notices under this Agreement shall be delivered in accordance with this provision. Notice will be deemed properly delivered, as of the date received by the non-noticing party, if given as follows:

- Notice to Quest Diagnostics shall be via email to: CommercialContracting@questdiagnostics.com

- Notice to LTC Facility shall be via traceable delivery method addressed as follows:
    Sprain Brook Manor Rehabilitation
    77 Jackson Ave Scarsdale, NY 10583
    ATTN: Allen Stein
    Email: israel@pinnaclehv.com

7.4   Each party represents and warrants that it is not an excluded provider (i.e., it has not been convicted of a crime related to health care or is not currently listed by a federal agency as debarred, excluded or otherwise ineligible for participation in federally funded programs (including, without limitation, federally funded healthcare programs, such as Medicare and Medicaid).  Each party shall notify the other within five days after it receives notice that the notifying party is an excluded provider.  The party receiving the notice shall have the right to terminate this agreement immediately upon receipt of such notice.

7.5   This Agreement constitutes the entire Agreement between Quest Diagnostics and LTC Facility with respect to the subject matter hereof and supersedes any prior understandings or agreements, except that the provisions of the Agreement by and between Quest Diagnostics and New York State which is attached hereto and is hereby incorporated herein (the "**State Agreement**") and  to the extent of any inconsistency the provisions of the State Agreement shall control.  No modification of this Agreement will have any force or effect unless such modification specifically indicates it is a modification of this Agreement, is in writing and signed by authorized representatives of both parties.

7.6   If any provision of this Agreement is found to be invalid, illegal, or unenforceable by a court of competent jurisdiction, the validity, legality, and enforceability of the remaining portion of the provision and all other provisions shall not be affected or impaired.

7.7   Terms of the Agreement. Except as required by law, the terms of this Agreement (including without limitation the pricing provisions) are confidential and may not be disclosed to third parties without the prior written consent of both parties. The provisions of this paragraph shall survive termination or expiration of this Agreement.

**8    LTC FACILITY ACKNOWLEDGEMENTS, REPRESENTATIONS, AND WARRANTIES.**

8.1   LTC Facility represents and warrants that it is an employer of the individuals whose specimens will be tested under this Agreement and is responsible for payment of the Services and that LTC Facility will comply with bill consistent with the terms of the applicable contracts between the payers and the individuals, or, if applicable, the uninsured fund that CMS has established for COVID-19 and state law.

8.2 LTC Facility represents and warrants that the Testing Services provided hereunder are only being ordered to enable LTC Facility to comply with EO 202.30, as such Executive Order may be extended from time to time, and/or to enable LTC Facility to conduct any mandated evaluations relating to medical surveillance of the workplace or to evaluate whether the individual has a work-related illness or injury.

8.3 LTC Facility represents and warrants that it is performing COVID-19-related testing of its Covered Employees because it needs such findings in order to comply with its obligations under 29 CFR parts 1904 through 1928, 30 CFR parts 50 through 90, or under state law having a similar purpose, to record any such illness or injury or to carry out responsibilities for workplace medical surveillance.

8.4 LTC Facility acknowledges and agrees that the clinical records of Covered Employees and other information relating to the ordering of laboratory tests and/or result reporting ("Covered Employee Data") is Protected Health Information under HIPAA. Accordingly, upon expiration of EO 202.30, and absent being replaced by similar state law, regulation, or executive order having a similar purpose to EO 202.30, LTC Facility acknowledges that it may need to obtain valid HIPAA authorizations from Covered Employees prior to requiring any disclosure of Covered Employee Data to LTC Facility by any Physician or Quest Diagnostics in connection with Testing Services provided under this Agreement.

9 **FORCE MAJEURE.** No party to this Agreement shall be liable for failure to perform any duty or obligation that said party may have under the Agreement where such failure has been caused by any event, foreseen or unforeseen, outside the reasonable control of the party who had the duty to perform and that renders performance impossible or impracticable, including, but not limited to: acts of God; acts of government; natural disasters such as floods, earthquakes, and severe weather events, including hurricanes; international or national hostilities, including acts of war (declared or undeclared), insurrection, terrorism, mass causality events, or other intentional violent actions; public health emergencies; fire; power failure; strike; lockout; riot; civil unrest; inevitable accident; inability to procure labor or materials; or any other event, like or unlike those listed above (collectively, "Force Majeure Event").

**IN WITNESS WHEREOF**, and intending to be legally bound hereby, the parties have executed this Agreement effective as of the date first above written.

**Quest Diagnostics Incorporated**

By: *Geoffrey Albrecht* (DocuSigned by: A46C0A0CD92442E...)

Print Name: Geoffrey S. Albrecht

Title: Regional Vice President – Northeast

Date: 10/30/2020 | 2:25 PM EDT

**Sprain Brook Manor Rehabilitation**

By: *Allen Stein* (DocuSigned by: EE7567324D6B463...)

Print Name: Allen Stein

Title: CEO

Date: 10/30/2020 | 2:10 PM EDT

**NEW YORK STATE AGREEMENT**

*[SEE ATTACHED]*

Page **5** of **5**

Revised 6.12.2020

# COVID – 19 LABORATORY TESTING SERVICES AGREEMENT

This Agreement (the "**AGREEMENT**") is between Quest Diagnostics Incorporated with offices at **One Malcolm Ave., Teterboro, New Jersey 07608** ("Quest Diagnostics" or "**Lab Provider**") and New York State Department of Health ("**NYS**") and is effective as of May 18, 2020 (the "**Effective Date**"). Each of Lab Provider and NYS may be referred to as a "**Party**" to this Agreement, and together, the "**Parties**".

The purpose of this Agreement is to express the agreement and terms for Quest Diagnostics to provide the COVID-19 RT-PCR (for the detection of SARS COV 2RNA) test and related services as set forth in Section 5 (the "Testing Services") in furtherance of the provisions of Governor Andrew M. Cuomo's Executive Order No. 202.30 issued on May 10, 2020, which directed the testing of all personnel, including all employees, contract staff, medical staff, operators and administrators, for COVID-19, twice per week, to nursing homes and adult care facilities, including all adult homes, enriched housing programs and assisted living residences ("Facilities").

1.  Testing Services.  The Parties agree to work together in good faith to evaluate and assess the need for the provision of Testing Services (as defined below) and to use commercially reasonable efforts to assist the Laboratory to effectuate agreements with the Facilities, that will be designated and mutually agreed to by the Parties.  The Parties further agree that they may periodically modify the list of designated Facilities, as necessary.

2.  Contemplated Relationship.  The Parties intend to execute this Agreement to document the understandings set forth in this Agreement.

3.  Expenses.  Except as set forth in this Agreement or further agreements, each Party shall bear its own legal, accounting and other expenses in connection with effectuating this Agreement.

4.  Further Agreements.  To the extent any additional agreements or documents are necessary to effectuate this Agreement, the Parties will negotiate and execute such agreements or documents in good faith.

5.  Services. Lab Provider will provide to Facilities the following services (collectively, the "**Testing Services**"):
    a. testing for the detection of COVID-19 using a COVID-19 molecular test that has Emergency Use Authorization (EUA) from the U.S. Food and Drug Administration (FDA) or that has been approved by the New York State Department of Health as a laboratory developed test ("COVID-19 Testing");
    b. a daily minimum of COVID-19 Testing at a daily average rate of 7500 tests per day and as set forth more fully in **Exhibit 1** to this Agreement, pursuant to electronic orders from the Facilities' medical directors, or other medical professional as otherwise approved by NYS and agreed upon by Lab Provider, who are authorized under state or federal law or guidance issued by federal or state authorities to order such laboratory tests;
    c. arrange for pickup of specimens, from the Providers at mutually agreed-upon locations and designated pick-up times to be identified on a weekly basis for the subsequent week by the Parties via courier services, where available and, as necessary and appropriate, provide materials for overnight delivery, lockboxes, cold packs and other supplies as mutually agreed by the Parties;
    d. Lab Provider's turn-around time for reporting and resulting from receipt of the specimen may vary based upon population served, demand and priorities among patients but Lab Provider's will be required to provide no less than 90% of the results within 3-4 days or less from accessioning at the lab on average; and
    e. reporting in an electronic format through existing connectivity methods using the Lab Provider portal.

6.  NYS responsibilities.  Lab Provider's obligations will be subject to and NYS will be responsible for performing the following:

63856.1

   a. identifying the participating Facilities for which Lab Provider will provide the Testing Services; and

   b. providing Lab Provider advance written notice at least two weeks in advance of any decision to expand its network of lab providers for COVID-19 Testing (RT-PCR ) and providing a reasonable opportunity for Lab Provider to increase its volume commitments prior to entering into a written contract with any other laboratory provider.  Lab Provider shall respond to any requested increase within two days.  If Lab Provider is unable to meet the increased requirement, NYS may enter into any arrangements with other laboratory providers for the Facilities identified in Exhibit A without additional notice to Lab Provider.

   c. Facilities will maintain on hand a daily minimum of specimen collection supplies for the collection of COVID-19 specimens that are to be tested by Lab Provider and as set forth more fully in **Exhibit 1** to this Agreement.

  7. <u>Compensation and Payment</u>.  Lab Provider agrees that the rate for testing will be no greater than One Hundred Dollars ($100.00) in accordance with https://www.cms.gov/files/document/cms-2020-01-r.pdf, or a lesser rate for comparable testing if the foregoing is modified by CMS for each completed COVID-19 PCR test reported or lower rate agreed to by the Lab Provider and Facility.

  Lab Provider will establish, the mechanism for payment, which may include but is not limited to, invoicing the Facility directly for the Testing Services on an account bill basis or the Facility's (or its employees to the extent applicable) insurance provider (e.g., individual and small group comprehensive health insurance, commercial insurance, or self-funded policies or contracts, Medicaid/Medicare or other federal funding sources, if applicable ("third party payors")).

  In the event that Lab Provider experiences any collection issues, Lab Provider shall provide NYS with written notice of such collection issues and upon demonstration that the Lab Provider and/or Facility has made reasonable efforts to obtain payment and has been denied payment from all  applicable or appropriate third-party payors NYS will  assist the Lab Provider and/or Facility in seeking reimbursement from such third-party payors, federal funding sources and/or other funding sources, as applicable, *(*which may include without limitation issuing additional directives or guidance, including working with agencies (state or federal) to issue directives to further support Lab Providers and/or Facilities in obtaining reimbursement for services rendered in compliance with the Executive Order 202.30, and enforcement of same*)*.

  8. <u>Fees and Costs</u>. Neither Party will look to the other Party to cover any of the direct or indirect costs for services provided to another Party pursuant to the Agreement unless otherwise mutually agreed to by the Parties. Each Party will reasonably assist the other in its efforts to seek its own reimbursement from federal funding sources, and other sources if requested, for example by providing appropriate documentation and records.

  9. <u>Reporting and Patient Results</u>.  Lab Provider will assist Facilities in establishing electronic connectivity, if necessary, such that orders will be submitted electronically and Lab Provider will send results to the Facilities electronically.   Facilities will be responsible for communicating the test results to the ordering healthcare provider, or other individual or entity authorized by NYS, and to each patient.  Lab Provider will be responsible for submitting any mandatory reporting to state authorities as well as any other reporting required and/or requested of laboratories by federal or state health authorities, including but not limited to the Centers for Disease Control.

  10. <u>HIPAA Compliance.</u>  The Parties shall comply with the Health Information Technology for Economic and Clinical Health Act, Title XIII of the American Recovery and Reinvestment Act of 2009 and related regulations promulgated by the Secretary (commonly referred to as the "HITECH Act") and the Health Insurance Portability and Accountability Act of 1996, 42 USC §1320d ("HIPAA")

and the regulations promulgated thereunder, including, without limitation, the federal privacy regulations (45 CFR Parts 160 and 164), the federal security standards (45 CFR Part 142), and the federal standards for electronic transactions (45 CFR Parts 160 and 162). However, notwithstanding the foregoing, the Parties agree that Enforcement Discretion Regarding COVID-19 Community-Based Testing Sites (CBTS) During the COVID-19 Nationwide Public Health Emergency dated April 9, 2020 [1] applies to the Lab Provider's good faith participation in the operation of specimen collection sites and the collection of specimens pursuant to this Agreement.

11. <u>Confidentiality</u>. "<u>Confidential Information</u>" means the terms of this Agreement and any necessary agreements, and with respect to a Party, any information or materials disclosed by or on behalf of such Party relating to such Party's business or operations that the other Party learns about in the course of negotiating this Agreement, or any necessary agreements, due to entering into this Agreement, or any necessary agreements or due to the relationship between the Parties, in each case, (a) that is not generally known other than by the disclosing Party and (b) that the receiving Party knew or should have known was confidential or proprietary. Each Party shall (i) advise each of its permitted recipients of the confidentiality obligations set forth herein and shall require each such permitted recipient to comply with such obligations, and (ii) shall maintain appropriate and adequate safeguards, policies and procedures to protect the other Party's Confidential Information against unauthorized use, disclosure, alteration or destruction. Each Party shall be responsible for any breach of the confidentiality obligations set forth herein by its permitted recipients.

12. <u>Binding Provisions</u>. The Parties agree that the provisions of this Agreement shall constitute legally binding obligations of the respective Parties.

13. <u>Term; Survival</u>. The term of this Agreement shall expire one year after it is executed. This Agreement may be terminated (i) for convenience at any time upon mutual written consent of the Parties or, (a) in the case of a termination for convenience by NYS, upon not less than thirty (30) days prior written notice, and (b) in the case of a termination for convenience by Lab Provider, upon not less than thirty (30) days prior written notice; (ii) by either Party, in the event of a material breach of this Agreement by the other Party, where the non-breaching Party gives written notice to the breaching Party, specifying in reasonable detail the material breach, and such breaching Party fails to cure the material breach within seven (7) days of receipt of the requisite notice; (iii) by NYS for the Non-Responsibility, as such term is defined in NYS SFL Section 163(c) of Lab Provider, upon not less than seven (7) days prior written notice to Lab Provider specifying in reasonable detail such Non-Responsibility, and (iv) by Lab Provider in the event any one or more Facilities does not timely pay invoices, or in the event Lab Provider has agreed to submit charges to third party payors and the third party payors deny payment for Testing Services on any basis, upon not less than ten (10) business days prior written notice to NYS and the Facility or Facilities.

14. <u>Compliance with Laws</u>. Each Party shall comply with all applicable laws, rules and regulations that relate to the conduct of the Parties' businesses and the performance by the Parties of their respective obligations under this Agreement, and any necessary agreements, including (without limitation) all applicable laws, rules and regulations regarding the collection, access, use, disclosure, electronic transmission, protection or storage of individually identifiable health information of patients. All provisions of this Agreement and any necessary agreements may be subject to further regulatory review. If further regulatory review requires that the terms of this Agreement, or any necessary agreements require

---

[1] See https://www.hhs.gov/sites/default/files/notification-enforcement-discretion-communitybased-testing-sites.pdf

63856.1

modification, the Parties will work in good faith to make necessary adjustments to the provisions of this Agreement or the agreements.

Lab Provider agrees to comply with all applicable programs established under Title XVIII ("Medicare") and XIX ("Medicaid") of the Social Security Act, U.S. Department of Health and Human Services, other federal entities, or any other required third-party payor, to obtain reimbursement for costs incurred in connection with services and expenditures incurred under the Agreement. Lab Provider agrees that, to the extent permitted by law, if it is reimbursed by the federal funding sources, such as, U.S. Department of Health and Human Services and any other third-party payor for expenditures that were made by the NYS, it will reimburse the NYS for such expenditures; however, the Parties agree that Lab Provider is not required to seek any such reimbursement under this Agreement.

15. <u>Press Release and Use of Marks</u>. Neither Party shall use the name, insignia, symbol, trademark, service mark, trade name, logos or any other information, design or device that identifies the other Party in any publication, media release, promotional or marketing material or activities, or other form of publicity without the prior written approval of the other Party, which shall not be unreasonably withheld.

16. <u>Indemnification</u>**.** Except for each Party's indemnification obligations for third-party claims, in no event will either Party be liable to the other for any indirect, special, exemplary, or consequential damages or loss of profits based on contract, tort, strict liability, negligence, or any other legal theory, even if the Party has been advised of the possibility of such damages. Lab Provider agrees to indemnify and hold harmless NYS from any and all claims, demands, judgments, losses, costs, expenses and other liabilities arising out of or incident to the gross negligence or intentional misconduct of Lab Provider (including its officers, employees, volunteers, and contractors, when acting within the course and scope of their employment) in performing Testing Services during the term of this Agreement, except to the extent arising out of the negligence or willful misconduct of NYS or any of its employees.

In accordance with the provisions of the Emergency or Disaster Treatment Protection Act (c. 56, L. 2020 part GGG), Lab Provider shall be immune from liability from any and all claims, complaints, actions, suits, demands, proceedings, arbitrations, or governmental or regulatory investigations with respect to any and all injury, disability, death, loss or damage to property arising out of this Agreement. This limitation of liability and release shall not apply to acts of willful or intentional criminal misconduct, recklessness, gross negligence or intentional wrongdoing of Lab Provider.

17. <u>Insurance</u>. Each Party agrees that each is responsible for its own insurance and will maintain appropriate coverage for their respective activities under this Agreement. Lab Provider agrees to furnish upon request a current and valid Certificate of Insurance, or proof of adequate self-insurance, evidencing its general liability and professional liability insurance coverage. The provisions of this section shall survive termination of this Agreement.

18. <u>PREP Act Immunity.</u> In addition to the immunity provided to Lab Provider above pursuant to Emergency or Disaster Treatment Protection Act (c. 56, L. 2020, part GGG), Lab Provider also is entitled to PREP Act immunity. The Secretary of HHS issued a Declaration under the Public Readiness and Emergency Preparedness Act ("PREP Act") for medical countermeasures against COVID-19 dated March 10, 2020 (the "Declaration"). *See* 85 Fed. Reg. 15,198 (March 17, 2020); *see also* Pub. L. No. 109-148, Public Health Service Act § 319F-3, 42 U.S.C. § 247d-6d and 42 U.S.C. § 247d-6e.

The PREP Act and Declaration cover and immunize from liability for damages "Covered Persons," which may include Companies (specifically including commercial labs), as well as any of the Company's officials, agents, employees, contractors and volunteers working in collaboration with federal, state or local governmental agencies with respect to the covered countermeasures.

"Covered Countermeasures" include COVID-19 testing kits and any subcomponent thereof utilized in connection with testing supported pursuant to this Agreement that have been authorized by the Food and Drug Administration, including through an Emergency Use Authorization.

Under the PREP Act and Declaration, Lab Provider, as well as other Covered Persons, are immunized from liability in accordance with the PREP Act and Declaration with respect to the administration of such Covered Countermeasures, which would include, but are not limited to, (i) testing at or for Providers, including specimen collection, processing, handling, or shipping specimens, (ii) using or providing real property in connection with efforts to provide specimen collection or testing, (iii) using or providing personnel or supplies in connection with the collection of specimens or test samples, or otherwise in connection with combatting COVID-19, or (iv) performing COVID-19 testing on specimens collected from any person. This immunity from liability does not depend on any particular specimen collection protocol, which HHS acknowledges may change over time. Nevertheless, HHS encourages all covered persons using or administering covered countermeasures to document the reasonable precautions taken to facilitate the safe use of covered countermeasures.

Under the Declaration, immunity will extend to claims of "loss," as defined in the PREP Act, by those who receive collection or testing services related to a Covered Countermeasure, as well as to anyone else involved or in proximity to collection or testing services (either to seek testing, or as employees or contractors, or for other purposes), or any other persons or entities who may assert a claim for loss against your Companies related in any way to a Covered Countermeasure and the administration thereof. If all requirements of the PREP Act and the Declaration are met, immunity covers claims for loss sounding in tort or contract, whether arising under state or federal law. The PREP Act immunity does not apply to affirmative actions by the federal government. As provided in the Declaration, immunity applies when a covered person engages in activities related to an agreement or arrangement with the federal government, or when a covered person acts according to an Authority Having Jurisdiction to respond to a declared emergency. These two conditions include (1) any arrangement with the federal government, or (2) any activity that is part of an authorized emergency response at the federal, regional, state, or local level. Such activities can be authorized through, among other things, guidance, requests for assistance, agreements, or other arrangements. Because the Secretary issued a Public Health Emergency declaration on January 31, 2020, effective as of January 27, 2020, the immunity granted by the PREP Act under this declaration applies regardless of whether state or local authorities have declared states of emergencies. The PREP Act expressly preempts any State and local law that "is different from, or is in conflict with, any requirement applicable under [the PREP Act]." 42 U.S.C. § 247d-6d(b)(8). This preemption authority includes any state or local law, regulation, or other legal requirement that would otherwise apply to the administration of a Covered Countermeasure. In addition, the PREP Act replaces certain damages claims that would normally be brought in court with a no-fault compensation system outlined at 42 C.F.R. pt. 110.

19.     Records.  Each Party agrees to maintain records for patients in such form and for such duration as may be required by federal, state or local statutes or regulations, and to make available to the Department of Health and Human Services, the U.S. Comptroller General and their designees upon reasonable request and in a reasonable manner its books, documents, and records relating to its provision of Testing Services under this Agreement as may be required by applicable statutes and regulations. Lab Provider acknowledges that these agencies and their designees have the right to audit, evaluate, or inspect Lab Provider's (or its subcontractors' or transferees') books, contracts, medical records, patient care documentation, and other records, related to recipients of federal and state funds.

20.     Subcontracting of Testing Services. Notwithstanding anything herein contained to the contrary, Lab Provider may subcontract all or any portion of the Testing Services to one or more Affiliates of Lab Provider. To the extent allowable by applicable law, Lab Provider shall bill and be paid or

reimbursed for all such subcontracted Testing Services. Lab Provider shall be solely responsible for the performance of the Testing Services provided by Affiliates hereunder, and the last two sentences of Section 18 of this Agreement shall apply to all Affiliates with full force and effect, as if each is a party to this Agreement. For purposes of this Agreement, "Affiliate" shall mean any entity controlling, controlled by or under common control with Lab Provider that is duly licensed to provide laboratory services in the State of New York.

21. <u>Miscellaneous</u>. The Parties undertake to act in good faith in any matter concerning this Agreement, and to execute in good faith any step that is needed in any way to give effect to any and all undertakings hereunder, according to any applicable law. Any amendment to this Agreement will be valid only if reduced to writing and signed by all Parties. The failure on the part of either of Party to exercise any of the rights conferred on such Party under this Agreement or under applicable law shall not be deemed to be a waiver thereof by such Party, unless such waiver was done explicitly and in a written notice signed by that Party. Notices by the Parties for the purposes of this Agreement shall be by hand delivery, email with confirmation of receipt, nationally recognized overnight carrier, or registered mail to the addresses appearing in the introductory paragraph to this Agreement.

22. <u>Governing Law</u>. This Agreement shall be governed, construed, and enforced in accordance with the laws of the State of New York or applicable federal common law and procurement statutes and regulations.

23. <u>Counterpart Execution</u>. This Agreement may be executed in any number of counterparts (including those delivered by electronic means), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

To show their agreement to the terms of this Agreement and to be legally bound by such terms, the Parties hereby execute this Agreement as of the Effective Date. Each person signing below certifies that he or she is authorized to bind their respective Party to all terms of this Agreement.

| New York State Department of Health | Quest Diagnostics Incorporated |
|---|---|
| By: _MaryBeth Hefner_ (DocuSigned, 61EA158E769040E...) | By: _Geoffrey Albrecht_ (DocuSigned, A46C0A0CD92442E...) |
| Print: MaryBeth Hefner | Print: Geoffrey Albrecht |
| Title: Deputy Commissioner for Administration | Title: RVP |
| Date: 5/28/2020 \| 8:17 PM EDT | Date: 5/28/2020 \| 8:05 PM EDT |

63856.1

# EXHIBIT 1

Lab Provider commits to processing a daily minimum of COVID-19 tests to the extent received from the Facilities as set forth below and as subject to adjustment above and by mutual agreement of the parties, provided that the Facility guarantees that it will provide no less than 50% of the amount of the forecasted tests, or other amount agreed to by the Lab Provider and Facility, required for testing (and shall compensate Lab Provider for any amount less than that at $100):

| Date | Number of Tests per day |
| --- | --- |
| Week of May 18, 2020 | 2500 tests per day (commencing when accounts are set up and once accounts are started) |
| Week of May 25, 2020 | 5000 tests/day |
| Week of June 1, 2020 and thereafter | 7500 tests/day (52,500 tests per week in aggregate) |

63856.1